**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

CALEIGH WOOD, *et al.*,

     Plaintiffs,

     -v.-

EVELYN ARNOLD, *et al.*,

     Defendants.

Civil Case No. 8: 16-cv-239

Judge George J. Hazel

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND IN RESPONSE TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

INTRODUCTION ................................................................................................................1

STATEMENT OF UNDISPUTED FACTS ..........................................................................2

I. STATEMENT OF ADDITIONAL UNDISPUTED FACTS .................................................2

II. DEFENDANTS' INCORRECT ASSERTIONS OF FACT ................................................5

STANDARD OF REVIEW .................................................................................................7

ARGUMENT ......................................................................................................................7

I. CALEIGH'S ESTABLISHMENT CLAUSE CLAIM .................................................8

II. CALEIGH WOOD'S FREE/COMPELLED SPEECH CLAIM .......................................12

III. DEFENDANTS' NO TRESPASS ORDER VIOLATED MR. WOOD'S FIRST AMENDMENT RIGHTS ...............................................................................................................14

    A.    Defendants Banned Mr. Wood's Protected Speech Because of his Viewpoint that Promotion of Islam in Public Schools is Unconstitutional ...................................15

    B.    Defendants Suppression of Mr. Wood's Protected Speech with a Categorical Ban from a Limited Public Forum is Not the Least Restrictive Means of Furthering a Compelling Governmental Interest ......................................................................17

        i.    *Mr. Wood Engaged in Protected Speech* ...................................................18

        ii.    *La Plata High School is a Limited Public* Forum .....................................19

        iii.    *Defendants Cannot Exclude Speech Based on the Speaker or the Content of his Speech in a Limited Public* Forum ......................................................19

            1.    The No-trespass Order Does Not Serve a Compelling Governmental Interest ...........................................................................................20

            2.    Defendants' Absolute Ban is Not Narrowly Tailored ...................21

IV. CALEIGH'S ARTICLE 36 CLAIM ......................................................................23

CONCLUSION ..................................................................................................................24

# INTRODUCTION

The undisputed facts demonstrate that Plaintiffs' claims prevail as a matter of law. Plaintiff Caleigh Wood ("Caleigh") was forced to endure the disparagement of her Christian faith in her 11th grade world history class, even after her father, Plaintiff John Wood ("Mr. Wood"), informed Defendants—who had the authority to remove her from the class promoting Islam—that the class promoted Islam over Christianity a required to complete written professions of the Islamic profession of faith. Defendants then forced her to continue the instruction without looking at any of the curricular materials. In response to his complaint, Defendants categorical banned Mr. Wood from the grounds of his daughter's school based on his "threat" to contact media and lawyers. Mr. Wood never made any physical threats. These facts are undisputed. And these facts demonstrate that the Court should grant Plaintiffs' motion for summary judgment.

Defendants' motion for summary judgment fundamentally misapprehends the legal issues at stake in this case. When correctly framed, the facts Defendants cite support Plaintiffs' motion, not their own. The issue here is not whether the teaching of comparative religions is appropriate. Plaintiffs do not take issue with comparative religions. Nor is the issue the broad-spectrum, expansive issue of a year-long world history course. Plaintiffs do not take issue with world history. What Plaintiffs do take issue with are subjective statements, taught as facts, that disparage the faith of Christians and promote Islam and Muslims over Christianity and Christians. Plaintiffs also take issue with the miniscule amount of time that Defendants spent teaching about Christianity compared to the two weeks Defendants spent promoting the religion of Islam. These—not comparative religions or world history—are the undisputed facts that must be analyzed under the applicable case law. Under these undisputed facts, Plaintiffs are entitled to judgment as a matter of law.

**STATEMENT OF UNDISPUTED FACTS**

I. **DEFENDANTS' INCORRECT ASSERTIONS OF FACT**

Plaintiffs agree with Defendants' undisputed facts with the exception of the following

seven facts which were not accurately portrayed or are in dispute:

First, Defendants state:

> M. The World History class taught by Mr. Bryden was based upon SDE's Core Learning Goals, Content Standards, and the statewide high school improvement initiative. *See* **Bryden Tr.** 110:2 – 20; *see also* ARNOLD AFFIDAVIT at **Exhibit D**. Caleigh and Mrs. Wood acknowledged receipt of the Course Syllabus issued by Mr. Bryden. *See id*. The Muslim World (including Islam) was introduced as part of the course unit on Middle Eastern empires. *See id*. In studying Word History, students also explored other religions, cultures, politics, and geography in the context of their impact on the development of civilization during other periods of time.

Memorandum of Law in Support of Motion for Summary Judgment 11-12, ECF 54-1

("Defs.' Memo"). This statement mischaracterizes the facts. While Caleigh and Mrs. Wood

acknowledged receipt of the course syllabus, the syllabus contains no mention of "[t]he Muslim

World (including Islam)," "Middle Eastern Empires," or "religions." *See* Bryden Tr. 108:11-

109:109:16. Notably, in Arnold Aff. Ex. D, Defendants mistakenly suggest that the class syllabus

included four pages when, in fact, it contained only three. The fourth page, attached hereto as

Exhibit 1, was not included in the syllabus. *See* Bryden Tr. 108:11-109:109:16. This critical

mistake negates any argument or suggestion that the Woods knew about or accepted that their

daughter would be instructed in Islam, or even taught about Islam and Muslims.

Second, Defendants state:

> S. On Thursday, October 23, 2014, Ms. Pearl returned Mr. Wood's phone call in an attempt to resolve Mr. Wood's concerns. *See* **Pearl Tr.** 23:7 – 24:5; *see also* ARNOLD AFFIDAVIT, ¶ 13 and **Exhibit F** attached thereto. During her telephone call with Mr. Wood, Ms. Pearl made note of Mr. Wood's aggressive tone, loud speaking volume, and constant interruptions. *Id*. Ms. Pearl referred to the World History curriculum in an attempt to convey to Mr. Wood that the students in

2

Caleigh's class were not encouraged to convert to Islam but, rather, were being taught about Middle Eastern empires on which Islam had an influence. *See id*; *see also* **Pearl Tr**. 30:16 − 21.

Defs.' Memo at 13. The characterization of Mr. Wood's conversation with Ms. Pearl is in dispute. Mr. Wood does not refer to the conversation as aggressive or loud. J. Wood Tr. 26:21-28:18.

Third, Defendants state:

> V. At approximately 3:45 p.m. on Thursday, October 23, 2014 − i.e., the same day that Ms. Pearl initially made contact with Mr. Wood − Vice Principal Morris telephoned Mr. Wood to invite Mr. Wood in for a conference to discuss Mr. Wood's concerns about the World History assignment as relayed to Vice Principal Morris by Ms. Pearl. *See* **Morris Tr.** 30:5 − 10; *see also* ARNOLD AFFIDAVIT at **Exhibit E**. Vice Principal Morris informed Mr. Wood that a conference between Principal Arnold, Ms. Pearl, Mr. Bryden, and Mr. Wood would be necessary to evaluate Mr. Wood's request that Caleigh be temporarily removed from Mr. Bryden's World History class and be given an alternative assignment. *See id*.; *see also* **Morris Tr**. 30:16 − 31:10. Mr. Wood became belligerent and threatening with Vice Principal Morris and interrupted her, exclaiming that he was "going to create a shit storm like you have never seen," and refusing to come in for the conference. *Id.* at 31:7 − 10. Additionally, Mr. Wood told Vice Principal Morris that, "you can take that fucking Islam and shove it up your white fucking ass!" at which time Vice Principal Morris immediately terminated the call. *See* **Morris Tr**. 31:14 − 16; *see also* ARNOLD AFFIDAVIT at **Exhibit E**.

Defs.' Memo at 14. Ms. Morris never offered to have Mr. Wood come in for a conference. J. Wood Decl. ¶¶ 22-28; *see also* J. Wood Tr. 61:8-13. Furthermore, Defendants account cherry picks quotes out of context, failing to mention that the "shit storm" Mr. Wood mention was the media and lawyers, not any actual threat. Arnold Aff. Ex. H, ECF 54-2, Page 26; Arnold Aff. Ex. E; Mersino Decl. Ex. 1. Even Defendant Morris's initial account of her conversation with Mr. Wood recognized this: "Mr. Wood said that he planned to 'call his lawyer and create a shit storm." Mersino Decl. Ex. 1; Arnold. Aff. Ex. E. This dispute of fact applies to Defendants' incorrect and colorful characterization of the phone call between Mr. Wood and Defendant Morris which

references in a myriad of ways throughout their statement of facts, including Sections BB. and

DD. This is a material fact that is in disputed even by Defendant Morris' own varying accounts.

Fourth, Defendants state:

> Z. . . . one of [Mr. Wood's] Facebook® friends encouraged Mr. Wood to "knife hand them," to which Mr. Wood responded "I don't plan on being so nice to them either!"

Defs.' Memo at 15-16. Mr. Wood's response, "I don't plan on being so nice to them either!"

is clearly to the comment, "I think they may not be so nice to you" two comments above, not, as

Defendants unreasonably suggest, in response to "knife hand them." Arnold Aff. Ex. H.

Fifth, Defendants state:

> FF. . . . Sgt. Kaylor confirmed that the No Trespass Order was issued because of Mr. Wood's behavior and threatening on-line Facebook posts.

Defs.' Memo at 17. This "fact" is not supported by the evidence. Sgt. Kaylor did not mention Mr.

Wood's "behavior." Kaylor Tr. 18:13-19:21. Sgt. Kaylor testified that the no trespass order was

issued exclusively on the Facebook postings. *Id.*

Sixth, Defendants state:

> GG. . . . issued the No Trespass Order on Friday, October 24, 2014 based upon threats Mr. Wood had made against the school.

Defs.' Memo at 17. Mr. Wood never made any threats against the school. J. Wood Decl. ¶ 35.

Seventh, Defendants state:

> HH. Sgt. Kaylor called Mr. Wood, in Principal Arnold's presence, to inform him that a No Trespass Order was being issued against him. *See* **Arnold Tr.** 66:17 – 20; *see also* ARNOLD AFFIDAVIT, ¶ 17. Despite Mr. Wood's continued yelling and hostile conduct, Sgt. Kaylor informed Mr. Wood that the No Trespass Order could be rescinded if he calmed down and met with Principal Arnold. *See id*; *see also* **Arnold Tr.** 67:6 – 18. *See also* **Kaylor Tr.** 16:7 – 17:8.

This, again, is incorrect. Sgt. Mark Kaylor, the only person on the phone with Mr. Wood,

described this conversation as "conversational." Kaylor Tr. 16:7-17:8. He does not mention

"yelling" and he does not characterize his conduct as "hostile." *Id.* Sgt. Kaylor did not discuss Mr. Wood's conduct at all as the conversation was exclusively telephonic. *Id.*

## II.  STATEMENT OF ADDITIONAL UNDISPUTED FACTS

A.    Caleigh Wood was taught that "Most Muslim's [sic] <u>faith is stronger</u> than the average Christian [sic]" (emphasis in original) and that "Islam, at heart, is a peaceful religion," and was forced to profess in writing that "There is no god but Allah," in her 11th grade World History class at La Plata High School. C. Wood Decl. ¶¶ 7-9; J. Wood Decl. ¶¶ 15-20; M. Wood Decl. ¶¶ 6-8. These statements and acts disparaged her Christian faith and promoted Islam over Christianity. C. Wood Decl. ¶¶ 7-11; M. Wood Decl. ¶¶ 4-8; J. Wood Decl. ¶¶ 15-29.

B.    When Caleigh Wood refused to complete the assignments that promoted Islam and demeaned her faith, she received no credit for those assignments, thus affecting her final grade. C. Wood Decl. ¶ 11.

C.    The only "threat" Mr. Wood made to anyone at La Plata High School was the threat to contact the media and lawyers if the school insisted on subjugating Caleigh to instruction in Islam. J. Wood Decl. ¶¶ 27, 32, 35; *see also* Mersino Decl. Ex. 1.

D.    Defendant Arnold, as principal of La Plata High School, had the authority to grant Caleigh an opt-out or alternate assignment from the world history instruction. Defendant Arnold did not exercise this authority, even after the Woods brought their concerns with the curriculum to her attention, instead, forcing Caleigh to undergo instruction in Islam which she believed to be in disparagement of her Christian faith. Hollstein Tr. 23:11-24:7, 48:17-4.

E.    Defendant Morris informed Mr. Wood that Caleigh could not receive an opt out from the curriculum that Caleigh believed supported Islam and demeaned Christianity. J. Wood Decl. ¶ 25; *see also* Morris Tr. 79:14-18.

F.      Principals are expected to do walk throughs of classrooms to ensure that classes are being taught in accordance with all applicable policies and law and to monitor instruction. Holstein Tr. 38:8-39:8. Superintendent Kimberley Hill, during her tenure as a principal, visited each classroom more than once a month and spent more time, about 65% of her time, walking through classrooms to monitor teachers than at her desk. Hill Tr. 14:18-16:10. In contrast, Principal Arnold does not recall if she made even a single walk through to observe Mr. Bryden's 11th grade World History class in the entire 2014/2015 school year. Arnold Tr. 106:18-107:4.

G.      The principal and vice principals at a school have the responsibility to review what is being taught in a classroom. Hill Tr. 32:12-33:6.

H.      Defendant Morris oversaw the social studies department during the 2014/2015 school year at La Plata High School. Pearl Tr. 14:1-17:11; Arnold Aff. Ex. B. This oversight included monitoring teachers within the social studies department, including Mr. Bryden's World History class, to make sure that they were following curriculum expectations. *Id*.

I.      Defendant Arnold, during the 2015/2016 school year, was responsible for making sure that teachers, including Mr. Bryden, were following curriculum. Pearl Tr. 19:4-20:6. This included the responsibility to look at the curriculum and visit the classrooms. *Id*.

J.      Principal Arnold neglected to evaluate the World History curriculum, even after Mr. Wood made a complaint, failing to even learn the context of curricular materials. Arnold Tr. 37:13-39:8. Principal Arnold did not ask to see the curriculum or ask for any materials related to the curriculum, instead, she just asked the teacher "if he was following the curriculum." Arnold Tr. 41:7-21.

K.      Jack Tuttle, the curriculum specialist for the Defendants, stated that it is inappropriate for a public school teacher to tell his class that "Most Muslim's [sic] faith is stronger

than the average Christian [sic]." Tuttle Tr. 49:3-11. Mr. Tuttle would not recommend forcing a child to learn that statement in a classroom. Tuttle Tr. 49:7-11. Mr. Tuttle, the content specialist, would advise a teacher not to teach such a statement and, since the statement is so "inflammatory" would notify up the chain of administration to get the statement removed from the classroom if a teacher continued instructing students that Muslims are stronger in their faith than Christians. Tuttle Tr. 50:2-51:16.

L.  Neither Defendant Arnold nor Defendant Morris asked Mr. Tuttle to evaluate the curriculum, including the document stating that "Most Muslim's [sic] faith is stronger than the average Christian [sic]," despite Mr. Wood informing them that he believed that the curriculum in their school promoted Islam and demeaned Christianity. Tuttle Tr. 63:19-64:6; C. Wood Decl. ¶¶ 7-8; Mersino Decl. Ex. 2.

M.  Faith is unquantifiable. Hollstein Tr. 28:20-29:2. The statement "Most Muslim's [sic] faith is stronger than the average Christian [sic]" is not a statement of fact. *Id*. 26:10-27:10.

N.  The Maryland State Education Standards do not require a teacher to instruct students that "Most Muslim's [sic] faith is stronger than the average Christian [sic]." Hill Tr. 32:4-11.

## STANDARD OF REVIEW

Plaintiffs agree with the standard of review presented by Defendants. Defs.' Memo at 18.

## ARGUMENT

Defendants had the duties and responsibilities to monitor classroom instruction, to investigate parent complaints, and to ensure that classroom instruction remained within the bounds of all applicable standards, including the Constitution. Hill Tr. 32:12-33:6; 14:18-16:10; Pearl Tr. 19:4-20:6; Hollstein Tr. 38:8-39:8; *see also* Hill Tr. 14:18-16:10. Despite these duties and

responsibilities, Defendants never visited the 11th grade world history classroom or reviewed any portions of the curriculum *even after a parent informed them of significant facts supporting his belief that portions of the curriculum promoted Islam and violated his daughter's constitutional rights*. J. Wood Decl. ¶ 25; Tuttle Tr. 63:19-64:6; C. Wood Decl. ¶¶ 7-8; Mersino Decl. Ex. 2 *see also* Morris Tr. 79:14-18. Without reviewing any documents, based solely on a teacher's affirmation that he "was following the curriculum," Defendant Arnold and Defendant Morris forced Caleigh to undergo instruction, teaching her that Muslims are stronger in their faith than she is as a Christian. C. Wood Decl. ¶¶ 7-9; J. Wood Decl. ¶¶ 15-20; M. Wood Decl. ¶¶ 6-8; Mersino Decl. Ex. 2. The undisputed facts of the case show that the Defendants by their actions and inaction were directly involved in forcing Caleigh to undergo religious instruction in violation of the United States Constitution.

## I. CALEIGH'S ESTABLISHMENT CLAUSE CLAIM

There is no dispute that Caleigh was instructed that "Most Muslim's [sic] faith is stronger than the average Christian [sic]." C. Wood Decl. ¶¶ 7-9; J. Wood Decl. ¶¶ 15-20; M. Wood Decl. ¶¶ 6-8. This statement alone unconstitutionally promotes Islam over Christianity. The Establishment Clause provides, "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. In order to prove that a challenged action does not violate the Constitution, the Defendants' actions must survive the test established in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). To survive constitutional scrutiny under the *Lemon* test: (1) the activity must have a secular purpose; (2) the primary effect of the activity must neither advance nor inhibit religion; and (3) the activity must not cause the government to be excessively entangled in religion. *Mellen v. Bunting*, 327 F.3d 355, 372 (4th Cir. 2003). If Defendants' acts violate any one of the three prongs, their actions are unconstitutional. *Id*. Here, Defendants fail all three prongs.

First, there is no secular purpose for Defendants forcing Caleigh Wood to learn, as a fact, that "Most Muslim's [sic] faith is stronger than the average Christian [sic]." C. Wood Decl. ¶¶ 7-9; J. Wood Decl. ¶¶ 15-20; M. Wood Decl. ¶¶ 6-8; Mersino Decl. Ex. 2. Defendants seem to argue that their lesson was secular simply because it took place in a World History class, rather than a religion class. *See* Defs.' Memo at 22. However, the Defendants' argument fails because it is not the title of the class that controls whether the content violates the Constitution. To hold otherwise would mean that the promotion of religion could run rampant in public schools as long as it was taught in an otherwise standard class. For instance, the literal Biblical view that the world was created in seven 24-hour days could be validly taught in public school so long as it was taught in science class. Of course, the Supreme Court has held otherwise in *Edwards v. Aguillard*, 482 U.S. 578 (1987) (holding that an act requiring creationism to be taught alongside evolutionism in *science* class violated the Establishment Clause).

Defendants attempt to couch their unconstitutional practices by asserting the vague and irrelevant idea that learning about Islam has a secular purpose. Defs.' Memo at 22. The constitutional issue in this case is not simply that Caleigh was taught about Islam in World History, but rather that Defendants' curriculum went beyond merely teaching about religion and promoted Islam as superior to all other religions, including Christianity.

The idea propounded by the Defendants that learning *about* religion is perfectly constitutional is irrelevant. Defendants must support the constitutionality of teaching students "Most Muslim's [sic] faith is stronger than the average Christian [sic]" by showing that such teaching has a secular purpose. C. Wood Decl. ¶¶ 7-9; J. Wood Decl. ¶¶ 15-20; M. Wood Decl. ¶¶ 6-8; Mersino Decl. Ex. 2. This is something they cannot do. Faith is a deep, personal, and religious sentiment that is entirely unquantifiable. Hollstein Tr. 28:20-29:2. Even Defendants' own content

specialist stated that this statement should not be taught in a public school. Tuttle Tr. 49:3-11, 50:2-51:16. This statement does not have a secular purpose because it does not teach any facts about Islam or Christianity. There is no purpose, other than the advancement of Islam, for this subjective statement. Defendants have not cited—because they cannot—any case law providing that a statement promoting religion is constitutional if the unconstitutional statement is made within the context of World History. Likewise, Defendants have not cited—because they cannot— any case law that supports their idea that you can ignore a statement which promotes a specific religion if it occurs in a class that otherwise has a secular purpose. This idea is preposterous. The Defendants would never countenance a teacher instructing her students that "the superiority of the Christian religion over all other religions is self-evident." The simple reason for this, of course, is because such a statement, presented by a public school teacher in a public school, would violate the Establishment Clause of the First Amendment. Similarly, the statement that "Most Muslim's [sic] faith is stronger than the average Christian [sic]," when taught by a public school teacher in a public school classroom, violates the Establishment Clause as a matter of law.

The Defendants rely heavily on *Sch. Dist. of Abington Twp., Pa. v. Schempp*, where the Supreme Court emphasized that a curriculum must be presented "objectively" to have a secular purpose. 374 U.S. 203, 225 (1963). However, this case actually supports the conclusion that Defendants violated the Establishment Clause. Here, the statement "Most Muslim's [sic] faith is stronger than the average Christian [sic]" is not an objective statement. *See* Hollstein Tr. 28:20-29:2, 26:10-27:10. Defendants admit as much when they state that this statement is "wanting in accuracy." Defs.' Memo at 25. The undisputed material facts, when looked at in light of the firmly established First Amendment jurisprudence reveals that the subjective statement "Most Muslim's [sic] faith is stronger than the average Christian [sic]" has no secular purpose and, therefore,

Defendants violated the Establishment Clause where they, as an exercise of their supervisory authority over instruction in their school, allowed such teaching to occur, even after it was brought to their attention.

Second, in order to determine whether the primary effect of the activity advances or inhibits religion, this Court must look at whether the effect of the statement "Most Muslim's [sic] faith is stronger than the average Christian [sic]" suggests a preference for a particular religious view or endorses one religious view over the others. *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1345 (4th Cir. 1995). As Defendants astutely note, "all endorsement of religion, whether framed in terms of promotion or favoritism, is impermissible." Defs.' Memo at 27 (citing *Cty. of Allegheny v. ACLU*, 492 U.S. 573, 592-94 (1989)).

The statement that "Most Muslim's [sic] faith is stronger than the average Christian [sic]," by its very terms, asserts a subjective proposition which expresses a view that Islam is preferable to Christianity. It "is sufficiently likely to be perceived by adherents of the controlling denomination[,] [Islam,] as an endorsement, and by nonadherents [Christians] as a disapproval, of their individual religious choices." *Cty. of Allegheny v. ACLU*, 492 U.S. 573, 611 (1989); C. Wood Decl. ¶¶ 7-11; M. Wood Decl. ¶¶ 4-8; J. Wood Decl. ¶¶ 15-29; *see also* Hollstein Tr. 28:20-29:2, 26:10-27:10; Tuttle Tr. 50:2-51:16. Thus, the statement has the effect of promoting Islam and Muslim's by subjectively opining that they are stronger in their faith than Christians.

Third, Defendants' curriculum fosters an excessive entanglement in religion. Yet again, Defendants' citation on this point supports Plaintiffs' argument. Defendants rightly note that the Establishment Clause forbids "the evangelist's mission statement." Defs.' Memo at 27-28 (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 867 (1995)). Defendants themselves admit that teaching that "Christ alone provides spiritual fulfillment," rather than an

"examination of religious doctrine," violates the Establishment Clause. Memo at 22 (quoting *Rosenberger v. Rector & Visitors of the Univ., of Va.,* 515 U.S. 819, 868 (1995)). Here, Defendants taught as fact a subjective assessment of religious faith, placing Muslims and their faith over Christians and the Christian faith. C. Wood Decl. ¶¶ 7-9; J. Wood Decl. ¶¶ 15-20; M. Wood Decl. ¶¶ 6-8; Mersino Decl. Ex. 2. This is not an examination of religious doctrine; it is government entanglement and judgment on the most personal and internal religious expression.

It is clearly established that public schools cannot promote religion and advance Islam as superior to all other religions. Yet that is exactly what Defendants allowed their teachers to do in their curriculum. For the foregoing reasons, Plaintiff Caleigh Wood is entitled to summary judgment against Defendants because they, by their actions and inactions, violated clearly established law.

## II.  CALEIGH WOOD'S FREE/COMPELLED SPEECH CLAIM

It is without dispute that curriculum implemented and supervised by the Defendants foisted upon Caleigh Woods the obligation to complete written work which required her to, in writing, make the Islamic profession of faith ("there is no god but Allah and Muhammed is his messenger") or suffer academic consequences. C. Wood Decl. ¶¶ 7-9; J. Wood Decl. ¶¶ 15-20; M. Wood Decl. ¶¶ 6-8. While Defendants correctly state that schools may sometimes "force a student to speak when the student would rather refrain." Defs.' Memo at 29 (quoting *C. N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 187 (3d Cir. 2005)). Defendants also correctly assert that "***a public educational institution may not demand that a student profess beliefs or views with which the student does not agree***." *Id.* (quoting *Ridgewood Bd. of Educ.*, 430 F.3d at 187). This is exactly what Defendants have done to Caleigh, making their actions unconstitutional as a matter of law. C. Wood Decl. ¶¶ 7-9; J. Wood Decl. ¶¶ 15-20; M. Wood Decl. ¶¶ 6-8.

The Supreme Court, in *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), condemned as unconstitutional a school's requirement that students only declare—not also believe—the pledge of allegiance, stating, "we are dealing with *a compulsion of students to declare a belief.*" *Id.* at 631-32 (emphasis added). The Court continues:

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, *religion*, or other matters of opinion *or force citizens to confess by word* or act *their faith therein*. If there are any circumstances which permit an exception, they do not now occur to us.

*Id.* at 642 (emphasis added). Since the Supreme Court has definitively established that school officials cannot "force [students] to confess by word . . . their faith" in a particular religion, Caleigh's right not to do so is clearly established and Defendants Arnold and Morris are not entitled to qualified immunity.

Even analyzed under the *Hazelwood* standard Defendants' suggest, Defendants' actions violate the First Amendment. As is discussed more fully above, because the Defendants' curriculum has no secular purpose, it simply cannot be related to a legitimate pedagogical concern of a public school. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). The Defendants' curricular decision to force upon Caleigh Wood a requirement that she submit a written profession of the Islamic creed cannot be viewed in a vacuum.  Defendants forced Caleigh Wood to profess her belief in Allah alone while, at the same time, instructing her that Muslims are stronger in their faith than Christians. When view in light of the Establishment Clause claim, it becomes all the more evident that the curriculum implemented and supervised by the Defendants compelled Caleigh to confess by written word her faith in Allah. C. Wood Decl. ¶¶ 7-9; J. Wood Decl. ¶¶ 15-20; M. Wood Decl. ¶¶ 6-8.

Thus, Defendants violated clearly established law and Plaintiffs are entitled to summary judgment.

### III. DEFENDANTS' NO TRESPASS ORDER VIOLATED MR. WOOD'S FIRST AMENDMENT RIGHTS

By prohibiting Mr. Wood from entering La Plata High School grounds, Defendants have deprived and are depriving Mr. Wood of his right to speak on and advocate for his daughter's curricular and extracurricular activities in violation of the First Amendment. Defendants provide virtually no analysis, merely pasting lengthy quotes from cases in their brief, because the facts demonstrate that the *only* "threat" Mr. Wood made was to contact the *media and his lawyers* if Defendants subjected his daughter to an unconstitutional curriculum. J. Wood Decl. ¶¶ 27, 32, 35; *see also* Mersino Decl. Ex. 1. Although oddly and amusingly, Defendants attempt to manufacture a threat out of confetti. Defs.' Memo at 33.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const., amend. I. This prohibition is applied to States and their subdivisions, including public schools, through the Fourteenth Amendment. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07 (1969). The Defendants are clearly attempting to justify their decision by reference to Mr. Wood's sometimes coarse language. Their attempts clearly miss the point that, under the First Amendment, even obnoxious language is entitled to protection. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011).

**A. Defendants Banned Mr. Wood's Protected Speech Because of his Viewpoint that Promotion of Islam in Public Schools is Unconstitutional.**

There is a categorical ban on viewpoint discrimination in all types of government property. *Child Evangelism Fellowship v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 (4th Cir. 2006). The government, including public schools, cannot ban "speech based on its substantive content or the message it conveys." *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)). The principal inquiry in determining whether a restriction on speech is imposed based on the speaker's viewpoint "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

This rule's corollary is that "administrators may not possess unfettered discretion to burden or ban speech, because 'without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker.'" *Child Evangelism Fellowship*, 470 F.3d. at 1068 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763-64 (1988)). Unless there are standards in place to protect speech, "*post hoc* rationalizations by [a school principal] and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the [principal] is . . . suppressing unfavorable[] expression." *Id.* (quoting *City of Lakewood*, 486 U.S. at 758-59). These "difficulties of proof and the case-by-case nature of 'as applied' challenges render the [principal's] action in large measure effectively unreviewable." *Id.* (quoting *City of Lakewood*, 486 U.S. at 759). Absent ascertainable criteria and clear standards, "speakers might engage in self-censorship out of fear they would be discriminated against based upon their views." *Id.*

In *Child Evangelism Fellowship*, the Fourth Circuit Court of Appeals reviewed a fee waiver system that allowed school administrators to waive fees "as determined to be in the district's best interest." *Id*. at 1069. This "carte blanche" standard could not satisfy the requirement—so important to viewpoint neutrality—of "narrow, objective, and definite standards." *Id*. (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969)); *see also Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 127 (1992) (holding "maintenance of public order" is not a sufficiently definite standard).

Here, Defendants Arnold and Morris banned Mr. Wood from the grounds of his daughter's school because they disagreed with his viewpoint that his daughter should receive alternative assignments to Defendants' unconstitutional promotion of Islam. J. Wood Decl. ¶¶ 22-27, 29-30, 32, 33-36. Their disagreement with Mr. Wood's message is the sole reason for the no-trespass order. *See, e.g.*, J. Wood Decl. ¶ 32; Mersino Decl. Ex. 2.

Defendant Arnold exercised unfettered discretion[1] to ban Mr. Wood from his daughter's school because she and Defendant Morris wanted to quash criticism of their pro-Islamic curriculum. J. Wood Decl. ¶¶ 34, 37-38; M. Wood Decl. ¶ 16; Ex. A. This exercise of unfettered discretion allowed Defendants Arnold and Morris to create *post hoc* rationalizations—such as making homework confetti—for the no-trespass order banning Mr. Wood for "threatening" the school *with a lawsuit and media coverage* to expose Defendants' unconstitutional practices. J.

---

[1] While Md. Educ. Code Ann. § 26-102, which Defendant Arnold cited as her authority for banning Mr. Wood, does contain some standards, Mr. Wood's telephone conversation clearly does not fall within any of the behaviors subject to a no-trespass order. The only behavior applicable to non-students is "[acting] in a manner that disrupts or disturbs the normal educational functions of the institution." Md. Educ. Code Ann. § 26-102(b)(3). "The only sensible reading of the statute is that there must . . . be an 'actual disturbance.'" *In re Jason W.*, 837 A.2d 168, 175 (Md. 2003). Mr. Wood never disrupted or disturbed the normal educational functions of La Plata High School as he never stepped foot on the grounds after his phone conversation with Defendant Morris. Defendant Arnold banned Mr. Wood from the school grounds based exclusively on Defendant Morris' opinion of a telephone conversation. "The absence of constraining standards . . . in administrators' practice renders [a policy] incompatible with the First Amendment." *Child Evangelism Fellowship*, 470 F.3d at 1072.

Wood Decl. ¶¶ 27, 30, 32. This is comparable to the carte blanche standard prohibited in *Child Evangelism Fellowship*. Between the time of Mr. Wood's phone conversations with Defendant Morris and the issuance of the no-trespass order, *Mr. Wood did not step foot on or near La Plata High School grounds*. J. Wood Decl. ¶ 32.

Defendant Arnold, pursuant to the policies and practices of the Board of Education of Charles County, exercised her unfettered discretion to ban Mr. Wood from the school premises (which, in turn, prevented him from further exercising his First Amendment right to complain about the curriculum) for pointing out the unconstitutionality of her school's curriculum. J. Wood Decl. ¶¶ 32, 34, 37-38; M. Wood Decl. ¶ 16; Ex. A. This suppression of Mr. Wood's speech is unconstitutional viewpoint discrimination.

**B.**     **Defendants Suppression of Mr. Wood's Protected Speech with a Categorical Ban from a Limited Public Forum is Not the Least Restrictive Means of Furthering a Compelling Governmental Interest**

Even if this Court determines that the Defendants did not silence Mr. Wood based on his viewpoint, the Defendants' restrictions on his speech still cannot withstand constitutional scrutiny. The Fourth Circuit utilizes a three-part test to determine whether a plaintiff has been deprived his freedom of speech. First, the court must determine that "the plaintiff has engaged in 'protected speech.'" *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)). Second, "the court 'must identify the nature of the forum.'" *Id*. (quoting *Cornelius*, 473 U.S. at 797). Third, the court "'must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard.'" *Id*. (quoting *Cornelius*, 473 U.S. at 797).

i.      *Mr. Wood Engaged in Protected Speech*

The category of "protected speech" is so vast that "even dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection." *Id.* at 248. When a person engages or attempts to engage in "pure speech," unlike expressive conduct, it is not difficult to establish that the First Amendment applies and protects the speech at issue. *Id*. at 247. Undoubtedly, speech concerning "instruction of the young," *see id.* (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 636 (1984) (O'Connor, J. concurring), and "the advancement of truth" are topics protected under the First Amendment. *Id.* (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

Here, not only did Defendants ban Mr. Wood *for* exercising his First Amendment right to free speech, but the no-trespass order was also a prior restraint on his ability to exercise his First Amendment rights on school grounds in the future. *C.f. Near v. Minn.*, 283 U.S. 697, 718 (1931) ("The fact that for approximately one hundred and fifty years there has been almost an entire absence of attempts to impose previous restraints upon publications relating to the malfeasance of public officers is significant of the deep-seated conviction that such restraints would violate constitutional right."); J. Wood Decl. ¶ 32. Defendants banned Mr. Wood from school grounds— effectively and categorically banning all speech, including protected speech. *Huminski v. Corsones*, 396 F.3d 53, 92 (2d Cir. 2004); *Wilson v. N. E. Indep. Sch. Dist.*, 2015 U.S. Dist. LEXIS 132324, at *8 (W.D. Tex. Sep. 30, 2015). Had Defendants not banned Mr. Wood, he would have advocated his position against promoting Islam in the schools at PTSO meetings and other events. J. Wood Decl. ¶¶ 39-43; M. Wood Decl. ¶¶ 15, 17-20; Ex. B. The First Amendment unquestionably protects this speech activity.

ii.       *La Plata High School is a Limited Public Forum*

A limited public forum "is not traditionally public, but the government has purposefully opened [it] to the public, *or some segment of the public*, for expressive activity." *ACLU v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005) (emphasis added) (finding a school campus a limited public forum). "[P]ublic school facilities [like La Plata High School] during after school hours . . . clearly are limited public fora." *Goulart*, 345 F.3d at 246. Therefore, because Defendants opened La Plata High School grounds for parents to receive information and exchange ideas, they created a limited public forum. *See* J. Wood Decl. ¶ 42.

iii.      *Defendants Cannot Exclude Speech Based on the Speaker or the Content of his Speech in a Limited Public Forum*

When the government opens its property and creates a limited public forum, it "is not required to . . . allow persons to engage in every type of speech . . . [and] may be justified in reserving its forum for certain groups or for the discussion of certain topics." *Goulart*, 345 F.3d at 249-50 (internal citations, quotation marks, and brackets omitted). When "the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available . . . the government's action is subject to strict scrutiny." *Id.* at 250; *Mote*, 423 F.3d at 444; *see also Henrico Prof'l Firefighters Asso. v. Bd. of Supervisors*, 649 F.2d 237, 242-43 (4th Cir. 1981) (holding "the status of the speaker . . . [cannot] be invoked as the reason for denying [] the opportunity to present views which the [government entity] would listen to if presented by others").

Mr. Wood is the parent of a student at La Plata High School, undoubtedly within the class to whom <u>parent</u>/teacher conferences, <u>Parent</u> Teacher School Organization meetings and events, and celebratory events honoring his daughter at the school are made generally available. Ex. B. Therefore, Mr. Wood's exclusion from these events for over a year "must be narrowly tailored to

serve a compelling governmental interest." *Greater Balt. Ctr. for Pregnancy Concerns v. Mayor & City Council*, 683 F.3d 539, 552 (4th Cir. 2012). When, as here, the regulation curtailing free speech is against an individual, and not the public generally, the Court must use a "more stringent application" of strict scrutiny—"**the most demanding test known to constitutional law**." *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994); *City of Boerne v. Flores,* 521 U.S. 507, 534 (1997) (emphasis added).

> 1. <u>The No-trespass Order Does Not Serve a Compelling Governmental Interest</u>

Defendants have no interest, much less a compelling one, for banning a father from the grounds of his daughter's school because he disagrees with the school's unconstitutional curriculum. For Defendants to demonstrate a compelling interest, they "must specifically identify an actual problem in need of solving." *Ctr. for Pregnancy Concerns*, 683 F.3d at 556 (quoting *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2740 (2011)) (internal quotation marks and citations omitted). Mere "anecdote[s] and supposition [do not] support a speech restriction." *Id.* (quoting *United States* v. *Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822 (2000)). "Where the State has opened a forum for direct citizen involvement, it is difficult to find justification for excluding [those] . . . who are most vitally concerned with the proceedings." *Madison Joint Sch. Dist. v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175 (1976).

Furthermore, it is antithetical to the principals of the First Amendment and to the interests of the government to prohibit speech pointing out unconstitutional practices. *C.f. Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014) ("It would be antithetical to our jurisprudence to conclude that the very kind of speech necessary to prosecute corruption by public officials—speech by public employees regarding information learned through their employment—may never form the basis for a First Amendment retaliation claim."). "It is essential" that "members of a community most

likely to have informed and definite opinions" are able to "speak out freely" without fear of retaliation. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 572 (1968).

Here, Mr. Wood was expressing his concerns with the unconstitutional promotion of Islam in Defendants' school by subjecting his daughter to attacks on her faith by propounding subjective statements such as "Most Muslim's [sic] faith is stronger than the average Christian [sic]." J. Wood Decl. ¶¶ 22-27, 29-32. The only claim Defendants made to support the no-trespass order was that Mr. Wood: (1) "would visit the school the following Monday," which is especially ironic considering Defendant Morris was adamant that she invited him to come to the school, Morris Tr. 30:5 – 10; (2) would shred his daughter's homework to use as confetti; and (3) try ***not*** to get arrested in *response* to someone else's comment. Defs.' Memo at 33. Defendants' bald assertion that statements of Mr. Wood were "threats" "ignore[s] the ancient wisdom that calling a thing by a name does not make it so." *Madison*, 429 U.S. at 174.

The Defendants undoubtedly do have a compelling interest in having parents express their views and bring constitutional violations to light. Defendants most certainly have no interest in silencing Mr. Wood or banning him from school grounds for making his constitutional concerns known in a constitutionally permissible way.

## 2. Defendants' Absolute Ban is Not Narrowly Tailored

Even if the Court assumes that Defendants had an interest in eliminating Mr. Wood's access to La Plata High School grounds, the absolute, categorical ban is not tailored at all—let alone narrowly tailored—as it entirely forecloses any means of communication. *C.f. Hill v. Colo.*, 530 U.S. 703, 726 (2000) ("when a content-neutral regulation ***does not*** entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal") (emphasis added); *see also Cyr*,

60 F. Supp. 3d at 548. In order for a restriction on speech to be narrowly tailored, it must be the "least restrictive alternative" to serve the government's purpose. *Ctr. for Pregnancy Concerns*, 683 F.3d at 556. "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Id.* at 557 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)). A regulation on speech is not narrowly tailored when it is "overinclusive" or "when the government has other, less speech-restrictive alternatives available." *Id.* (citing *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd*., 502 U.S. 105, 120-21 (1991); *Playboy Entm't Group*, 529 U.S. at 816-17). The no-trespass order is overinclusive and is not the least speech-restrictive alternative available.

Here, ostensibly because Defendant Morris claimed Mr. Wood's protected free speech was a "threat," Defendants unconditionally banned Mr. Wood from school grounds at all hours of the day for over a year. J. Wood Decl. Ex. A. There are many less restrictive means Defendants could have used to protect against a perceived "threat," such as, moving parent meetings to a neutral location, requiring Mr. Wood to maintain a certain distance from Defendants Arnold and Morris, limiting the no-trespass order's indefinite ban to a specified time, or at least allowing Mr. Wood on school grounds if he remained in his car so he could pick his daughter up from school protecting her from walking off campus unaccompanied. The sweeping, categorical ban against Mr. Wood's speech is overinclusive and not the least restrictive means available. Therefore, it is not narrowly tailored and violates Mr. Wood's First Amendment rights. *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 575 (1987) ("We think it obvious that ["a sweeping"] ban [on First Amendment activities] cannot be justified even [in a] nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech."); *Huminski*, 396 F.3d at 92 (holding that categorical no-trespass orders "do <u>not</u> meet the test for reasonableness")

(emphasis in original); *Barna v. Bd. of Sch. Dirs.*, 2015 U.S. Dist. LEXIS 151129, at \*35-36 (M.D. Pa. Nov. 6, 2015) (holding that an absolute ban from school grounds is not narrowly tailored); *Wilson*, 2015 U.S. Dist. LEXIS 132324, at \*17 (holding that a categorical ban from school grounds has *no* tailoring); *Cyr*, 60 F. Supp. 3d at 548 (holding that a categorical ban from school grounds is not tailored in response to the threat when the parent visited the school almost every day, stalked school employees, and shook his fist at school employees); *Stevens v. Sch. City of Hobart*, 2015 U.S. Dist. LEXIS 106349, at \*36 (N.D. Ind. Aug. 6, 2015) (holding that the categorical ban of a teacher who molested a student from school grounds was not narrowly tailored); *Brown v. City of Jacksonville*, 2006 U.S. Dist. LEXIS 8162, at \*2 (M.D. Fla. Feb. 16, 2006) (holding that a "sweeping ban" from city council meetings that lasted only three months was not narrowly tailored).

While principals and school administrators are afforded some authority, the law clearly and plainly prohibits school administrators from suppressing the speech of a parent who disagrees with the curriculum, even when the parent uses the curriculum as confetti. Thus, Plaintiff John Wood is entitled to summary judgment under the facts even as Defendants describe them. In the alternative, if the Court determines that Defendants' story of Mr. Wood's actions do not support a judgment in favor of the Plaintiff, there is a genuine and material dispute of fact and Defendants are not entitled to summary judgment.

## IV.    CALEIGH'S ARTICLE 36 CLAIM

Article 36 of the Declaration of Rights of the Constitution of Maryland give[s] extensive protection to religious liberty." *McMillan v. State*, 258 Md. 147, 151 (1970). It expressly condemns Defendants' actions in Article 36— "Nothing shall . . . require the *making reference to belief* in, reliance upon, or invoking the aid of God or a Supreme Being in any governmental . . . school . .

." Md. Decl. of Rights 36. There is no ruling "that Article 36 . . . does *not* give rise to a private cause of action for damages." *Jenkins v. Kurtinitis*, 2015 U.S. Dist. LEXIS 34772 at *98 (D. Md. March 20, 2015. Thus, as is explained in great detail above, the curriculum enacted and supervised by the Defendants required Caleigh to engage in a written profession of the Islamic creed that "there is no god but Allah and Mohammed is his prophet." C. Wood Decl. ¶¶ 7, 9. This clearly required her to make reference to belief in a Supreme Being as stated by this Islamic religion. For this reason, Caleigh is entitled to summary judgment under Article 36.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for summary judgment and deny Defendants' motion for summary judgment.

Date: June 29, 2017                                    Respectfully submitted,


                                                       /s/ Kate Oliveri
                                                       Kate Oliveri
                                                       MI Bar No. P79932; MD Bar ID 804738*

                                                       THOMAS MORE LAW CENTER
                                                       Richard Thompson
                                                       MI Bar No. P21410; MD Bar ID 804739*
                                                       Brandon Bolling
                                                       MI Bar No. P60195; MD Bar ID 806876*
                                                       24 Frank Lloyd Wright Drive
                                                       P.O. Box 393
                                                       Ann Arbor, MI 48106
                                                       Phone: 734.827.2001
                                                       Fax: 734.930.7160
                                                       koliveri@thomasmore.org
                                                       rthompson@thomasmore.org
                                                       bbolling@thomasmore.org
                                                       *Pro hac vice*

                                                       THE LAW OFFICE OF
                                                       MICHAEL J. MORAN, P.C.
                                                       Michael J. Moran
                                                       MD Bar No. 01363

3407 Eastern Blvd.
Middle River, MD 21220-2145
Phone: (410) 687-8494
Fax: (410) 391-4046
mikemoran@verizon.net

*Attorneys for Plaintiff*