
# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

|  |  |
|---|---|
| **CALEIGH WOOD**, *et al.*, | * |
| **Plaintiffs,**[1] | * |
|  | * |
| **v.** | **Case No.: GJH-16-239** |
|  | * |
| **EVELYN ARNOLD**, *et al.*, | * |
| **Defendants.** | * |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

## MEMORANDUM OPINION

The Establishment Clause of the First Amendment to the United States Constitution prohibits the "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Lemon v. Kurtzman,* 403 U.S. 602, 612 (1971) (citing *Walz v. Tax Commission,* 397 U.S. 664, 668 (1970)). This principle exists because "religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." *Lee v. Weisman,* 505 U.S. 577, 589 (1992). Additionally, the First Amendment prevents the government from prohibiting speech or compelling individuals to express certain views. *United States v. United Foods, Inc.,* 533 U.S. 405, 410 (2001). But the First Amendment does not afford the right to build impenetrable silos, completely separating adherents of one religion from ever learning of beliefs contrary to their own. Nor, in this Court's view, does it prohibit a high school teacher from leading a purely academic study of a religion that may differ from the religious beliefs of some of his students.

---

[1] Following Plaintiffs' Amended Complaint, ECF No. 39, the docket will be updated to reflect the current Plaintiffs as John Wood and Caleigh Wood.

In this action, Plaintiffs Caleigh Wood and John Kevin Wood allege that Defendants Evelyn Arnold ("Principal Arnold") and Shannon Morris ("Vice Principal Morris") violated Ms. Wood's First Amendment rights by requiring her to study Islam as part of a World History course, and retaliated against Mr. Wood by banning him from school grounds after he exercised his First Amendment rights by complaining about the course. The following motions are presently pending before the Court: Plaintiffs' Second Motion to Alter or Amend the Complaint, ECF No. 47, Defendants' Motion for Summary Judgment, ECF No. 54, and Plaintiffs' Cross Motion for Summary Judgment, ECF No. 55. A hearing was held on November 6, 2017. Loc. R. 105.6 (D. Md. 2016). For the reasons stated below, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiffs' motions.

## I.      BACKGROUND

### A.  Factual Background[2]

Caleigh Wood attended La Plata High School during the 2014-2015 school year ("Relevant Period"), during which she was an 11th grade student. ECF No. 54-13 at 2.[3] Principal Arnold was the school principal at La Plata during the Relevant Period. ECF Nos. 54-13 at 2–3; 54-2 at 2–3, 10; 54-4 at 2. One of Principal Arnold's primary responsibilities was to maintain the safe and orderly operation of the school environment. ECF No. 54-4 at 2. During the Relevant Period, Sgt. Mark Kaylor was employed by the Charles County Sheriff's Department and was assigned to La Plata as a School Resource Officer. ECF Nos. 54-8 at 2–3; 54-2 at 2–3.

World History is a required course mandated by the Maryland State Department of Education, is part of the social studies curriculum, and is taught in the 11th grade at La Plata. ECF No. 54-2 at 3. During the Relevant Period, Ms. Wood was enrolled in a World History class

---

[2] Unless otherwise noted, the facts relied on are undisputed by the parties.
[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

taught by social studies teacher Trevor Bryden and received a passing grade. ECF No. 54-2 at 11; ECF No. 54-13 at 6, 7. The topic "Muslim World (including Islam)" was introduced in the World History class as part of the course unit on Middle Eastern empires. ECF Nos. 54-5 at 6; 54-2 at 14.

During the class, Ms. Wood was taught, *inter alia*, that "Most Muslim's [sic] <u>faith is stronger</u> than the average Christian [sic]"[4] (emphasis in original) and that "Islam, at heart, is a peaceful religion." ECF Nos. 55-2 at 3; 55-4 at 3. Additionally, one of Ms. Wood's assignments was to complete a worksheet where she had to provide missing words within the statements that comprise the "Five Pillars of Islam." ECF No. 56-3. This included a sentence stating that "There is no god but Allah and Muhammad is the messenger of Allah," which is also known as the *Shahada. Id.* When Ms. Wood refused to complete assignments, she received no credit for those assignments; but the parties dispute the impact, if any, that any uncompleted assignments had on her final grade. ECF No. 55-2 at 3; 56-1. Principal Arnold had the authority to grant Ms. Wood an opt-out or alternate assignments. ECF No. 55-7 at 2–3. Jack Tuttle, the curriculum specialist for the Defendants, agreed that it is not appropriate for a public school teacher to tell his class that "Most Muslim's [sic] faith is stronger than the average Christian [sic]." ECF No. 55-9 at 1–2.

Neither Principal Arnold nor Vice Principal Morris ever spoke with Ms. Wood about their religious beliefs during the Relevant Period or at any other time, nor did they suggest Ms. Wood practice the Islamic faith. ECF No. 54-13 at 8–9. Additionally, neither Principal Arnold

---

[4] This statement appears on a PowerPoint slide attached to the original complaint, ECF No. 1-1, and Ms. Wood declares that this statement was included in an assignment she received. ECF No. 55-2 ¶ 8. However, Mr. Bryden states that while he provided all the material he had related to his World History course, including the slide, he does not recall if the statement was actually presented to the class. ECF No. 56-5; ECF No. 56 at 7 n.4. As this is a disputed fact, the Court will construe this in favor of Plaintiff, for the purpose of resolving Defendants' motion, and assume the statement was in fact taught to Ms. Wood.

nor Vice Principal Morris ever directed Ms. Wood to recite the five pillars of the Islamic faith, pledge allegiance to Allah, profess the *Shahada* or direct Ms. Wood to profess or write out faith statements concerning Islam. ECF Nos. 54-2 at 5–6; 54-3 at 2.

On Wednesday, October 22, 2014, Mr. Wood telephoned La Plata and left a voicemail in which he expressed his concern about the homework assignment that Ms. Wood had been given in Mr. Bryden's World History class. ECF No. 54-12 at 2, 3. On Thursday, October 23, 2014, Ms. Shanif Pearl, the administrative assistant, returned Mr. Wood's phone call in an attempt to resolve Mr. Wood's concerns. ECF Nos. 54-10 at 5–6; 54-2 at 4, 17. On the same day, Vice Principal Morris also telephoned Mr. Wood. At some point during that conversation, Mr. Wood stated that he was "going to create a shit storm like you have never seen."[5] ECF No. 54-9 at 3–4. Additionally, Mr. Wood stated that "you can take that fucking Islam and shove it up your white fucking ass!" ECF Nos. 54-9 at 4; 54-2 at 16. According to Principal Arnold, Vice Principal Morris was visibly shaken when later describing the conversation with Mr. Wood. ECF No. 54-2 at 3–4.

Around the time she became aware of the conversation with Vice Principal Morris, Principal Arnold became aware of online posts by Mr. Wood on Facebook® that caused her to be increasingly concerned about the safe and orderly operation of La Plata. ECF Nos. 54-2 at 19; 54-4 at 3. In one post, Mr. Wood, while talking about his daughter studying Islam, states: "I just about fucking lost it . . . My white ass is going into school on Monday and letting my feelings be known. Caleigh said her teacher was a Navy Seal. Can you guess what I said to that! I'm fucking livid!!!!!!!." ECF No. 54-2 at 19. In response to a comment from a friend cautioning him not to get arrested, Mr. Wood responded that he would "try." *Id.* In response to a suggestion that he

---

[5] Mr. Wood states this was a reference to contacting lawyers and the media regarding the incident. Indeed, in her real-time memo regarding the call, Morris records that he said "I just want you to know that lawyers have been contacted and I'm going to create a shit storm like you have never seen." ECF No. 54-2 at 16.

4

study Islam because he could not defeat what he could not understand, Mr. Wood stated that a "556 doesn't study Islam and it kills them fuckers every day."[6] *Id.* In a subsequent post, Mr. Wood states that he would use his daughter's study sheet as "confetti on Monday!" ECF No. 54-2 at 22. These interactions took place during the school's Homecoming week. ECF No. 54-2 at 4.

Principal Arnold sought the assistance of Central Office administrators regarding Mr. Wood's demeanor, his interactions with Vice Principal Morris, and Principal Arnold's growing concern for the safe and orderly operation of La Plata. ECF No. 54-2 at 4. In her email to Central Office, Principal Arnold states "At this point I am happy to call Mr. Wood myself but he doesn't appear to want to listen and instead wants to curse and scream. His demeanor on the phone was so extreme that I do have concerns about him coming up to the school. Since he works at Ft. Belvoir and states that he is a Marine, I am assuming that he has access to weapons." ECF No. 54-2 at 18. Principal Arnold also discussed her concerns with Sgt. Kaylor, who prepared a No Trespass Order for Principal Arnold's signature after reviewing the Facebook® posts. ECF No. 54-8 at 4–5, 8–9. Sgt. Kaylor informed Mr. Wood that a No Trespass Order was being issued against him. ECF Nos. 54-8 at 5; 54-4 at 8. Mr. Wood never contacted Principal Arnold to meet about rescinding the No Trespass Order. ECF No. 54-2 at 5.

### B. Procedural Background

Plaintiffs filed the instant Complaint on January 27, 2016, seeking declaratory and injunctive relief, damages, and attorneys' fees under 42 U.S.C. § 1983 based on claims under the First and Fourteenth Amendments, Title IX of the Education Amendments of 1972, Title VI of the Civil Rights Act of 1964, and Article 36 of the Declaration of Rights of the Maryland

---

[6] A "556" is a reference to 5.56 millimeter caliber ammunition used in the U.S. Armed Forces' standard-issue rifle. *See* https://en.wikipedia.org/wiki/M16_rifle (last visited March 26, 2018).

Constitution. ECF No. 1. On September 30, 2016, the Court denied Plaintiffs' Motion for a Preliminary Injunction and granted, in part, Defendants' Motion to Dismiss. ECF No. 36. The Court dismissed all claims against the Board of Education of Charles County, as well as Principal Arnold and Vice Principal Morris in their official capacities. In addition, the Court dismissed Plaintiffs' retaliation claim asserted on behalf of Ms. Wood, Plaintiffs' procedural due process claim asserted on behalf of Mr. Wood, and Plaintiffs' Title IX and Title VI claims. Following this Order, Plaintiffs' filed an Amended Complaint, ECF No. 39, removing Charles County as a named defendant, and substituting Ms. Wood as a named plaintiff, in place of her mother Melissa Wood, as Ms. Wood is no longer a minor child. Plaintiffs also removed their claims under Title IX and Title VI. As a result of the Court's Order and Amended Complaint, the following claims remain: First Amendment Establishment Clause violation on behalf of Ms. Wood (Claim I); First Amended Freedom of Speech violation on behalf of Ms. Wood (Claim II); First Amendment Retaliation on behalf of Mr. Wood (Claim III); and Violation of Article 36 of the Maryland Declaration of Rights on behalf of Ms. Wood (Claim V).

## II. STANDARD OF REVIEW

A party may move for summary judgment under Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings . . . together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 466 U.S. 317, 323 (1986) (internal citation omitted). In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a

6

genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). To withstand a motion for summary judgment, the nonmoving party must do more than present a mere scintilla of evidence. *Phillips v. CSX Transport, Inc.*, 190 F.3d 285, 287 (4th Cir. 1999). Rather, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. Although the Court should draw all justifiable inferences in the nonmoving party's favor, the nonmoving party cannot create a genuine issue of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

Cross-motions for summary judgment require that the Court consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "The Court must deny both motions if it finds there is a genuine issue of material fact, but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *Wallace v. Poulos*, No. DKC 2008-0251, 2009 U.S. Dist. LEXIS 89700, at *13 (D. Md. Sept. 29, 2009) (internal citation omitted).

## III. DISCUSSION

Plaintiffs' assert constitutional violations pursuant to 42 U.S.C. § 1983. Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding . . .

7

42 U.S.C. § 1983. Here, Plaintiffs' remaining claims assert that their rights under the First

Amendment were violated.[7] Specifically, Plaintiffs claim that Ms. Wood's rights under the

Establishment Clause were violated through the teaching of Islam in her public school, Ms.

Wood's right to Free Speech was violated when she was required to "confess" the *Shahada* and

that Mr. Wood was subjected to First Amendment Retaliation when he was banned from school

grounds after he expressed his opposition to the school's teaching. Each claim will be addressed

in turn.

### A. Ms. Wood's First Amendment Establishment Clause Claim

Plaintiffs' claim that Defendants violated the Establishment Clause focuses primarily on

a statement made by a teacher during Ms. Wood's World History class that "Most Muslims [sic]

faith is stronger than the average Christian [sic]" (the "comparative faith statement"). ECF No.

55-1 at 10.[8] And, indeed, as the Court has mentioned during the motion hearings in this matter, it

is this statement that presents the most significant difficulty for the Defendants' case. The

Establishment Clause provides that "Congress shall make no law respecting an establishment of

religion." U.S. Const. amend. I. Generally, the constitutionality of government action under the

Establishment Clause is determined by applying the three prong test outlined in *Lemon*. Pursuant

to *Lemon*, for the action to be constitutional, (1) the government activity must have a secular

purpose, (2) the primary effect of the government activity must neither advance nor inhibit

---

[7] "[T]he First Amendment's mandate that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof' has been made wholly applicable to the States by the Fourteenth Amendment." *School District of Abington Township, Pennsylvania v. Schempp,* 374 U.S. 203, 215 (1963).
[8] In the Amended Complaint, Plaintiffs list a litany of objections to the study of Islam in the World History course, including the length of the unit, *id.* ¶ 9, focus on Islam over Christianity or Judaism, *id.* ¶ 55, omission of Islamic-related topics from the syllabus and textbook sent home with students as compared to that actually used in class, *id.* ¶ 5, reference to cultural practices placing women as subservient to men, *id.* ¶ 56, and discussions pertaining to "jihad," *id.* ¶ 53. But the motions for summary judgment focus almost entirely on the allegations that Ms. Wood was instructed that "Most Muslim's faith is stronger than the average Christian," *id.* ¶ 51 (citing ECF No. 1-1), and that Ms. Wood "had to profess the *Shahada,* by claiming, 'There is no god but Allah and Muhammad is the messenger of Allah.'" ECF No. 39 ¶ 52 (citing ECF No. 1-2).

religion; and (3) the activity must not cause the government to be excessively entangled in religion. 402 U.S. at 612–13.[9] The three factors are addressed in turn.

First, Plaintiffs argue that the comparative faith statement has no secular purpose because it does not teach any verifiable and objective facts about Islam. ECF No. 55-1 at 12. "In applying the purpose test, it is appropriate to ask 'whether the government's actual purpose is to endorse or disapprove of religion." *Mellen v. Bunting*, 327 F.3d 355, 372 (4th Cir. 2003) (quoting *Wallace v. Jaffree*, 105 S.Ct. 2479 (1985)). "The secular purpose requirement presents a fairly low hurdle for the state" and "a state-sponsored practice violates this prong of *Lemon* only 'if it is *entirely* motivated by a purpose to advance religion.'" *Id.* (emphasis in *Mellen*).

In considering the secular purpose of the comparative faith statement, as well as in the analysis of the second and third *Lemon* factors, it is important to consider whether the Court should view the statement in isolation or in the context of the curriculum as a whole. Plaintiffs contend that the Court should analyze this statement in isolation, divorced from the context of the class as a whole. During the hearing on the pending motions, Plaintiffs directed the Court to *C.F. v. Capistrano*, 615 F. Supp. 2d 1137 (C.D. Ca. 2009) to support their position. In *Capistrano*, an out-of-circuit case that was vacated on appeal, a teacher stated that creationism is "superstitious nonsense," and the district court held that it could not "discern a legitimate secular purpose in this statement, *even when considered in context.*" *Id.* at 1146 (emphasis added). Thus, this case does not suggest that the Court must review the comparative faith statement in complete isolation and ignore the context in which it was presented. Here, the Court finds it necessary to place the statement in the context of the class in which it was made to discern both purpose and effect.

---

[9] As the Court recognized in its prior Memorandum Opinion, *Lemon's* three-part test provides a useful framework for evaluating Establishment Clause claims but need not be rigidly applied. ECF No. 35 at 14 n.7 (referencing other Establishment Clause tests, such as the coercion test and endorsement test).

Generally, the study of religious texts and concepts can be secular in purpose. *School District of Abington Township, Pennsylvania v. Schempp*, 374 U.S. 203, 225 (1963). According to Defendants, the Muslim World curriculum was "designed to explore, among other things, formation of Middle Eastern empires including the basic concepts of the Islamic faith and how it along with politics, culture, economics, and geography contributed to the development of those empires." ECF No. 54-1 at 24. The record provides no suggestion that anyone from the school board down through the individual teacher held any bias for or against any religion, or that Defendants' explanation of the curriculum served as cover for a religiously-motivated purpose. *Cf. Edwards v. Aguillard*, 482 U.S. 578, 587 (1987) (finding that legislation requiring the teaching of creationism along with evolution did not have a secular purpose because the legislative history suggested that the purpose "was to narrow the science curriculum").

The Supreme Court's decision in *Abington* is instructive here. There, in two companion cases, state laws required the Holy Bible to be read at the opening of each public school day. *Abington*, 374 U.S. at 205. The readings were broadcast to each classroom and were followed by the Lord's Prayer, during which students were asked to stand and join in repeating the prayer in unison. *Id.* at 207. Participation in these exercises was voluntary. *Id.* Given the religious character of the exercises, the Supreme Court rejected the notion that the purpose of the use of the Bible was for "nonreligious moral inspiration or as reference for the teaching of secular subjects." *Id.* at 224. Concluding that the laws in both cases required "religious exercises," the Supreme Court found that they violated the Establishment Clause. *Id.* But, of significance here, the Court also stated that "[n]othing we have said here indicates that such study of the Bible or of religion, when presented objectively as part of a secular program of education, may not be effected consistently with the First Amendment." *Id.* at 225.

Relying on *Abington,* the crux of Plaintiffs' argument is that because the comparative

faith statement is not "objective," it cannot have a secular purpose. ECF No. 55-1 at 12. But

notwithstanding the single comparative faith statement in the PowerPoint slide, the material was

presented as part of an academic exercise and not a religious one. This is also true of the

assignment that required the students to fill-in-the-blanks for the *Shahada.* The students were not

being required to recite the *Shahada* daily, which would make it analogous to *Abington,* or to

recite it at all. Nor were they required to memorize only that specific statement of faith, which

could serve to highlight it. Rather, they were required to fill in statements to complete the

*Shahada* along with a variety of factual statements related to Islam, including, but not limited to,

the relevant continents, biographical information about the Prophet Muhammad, and the fact that

Muslims, Christians and Jews all trace their ancestry to Abraham. ECF No. 1-2. Thus, it is clear

that this was the sort of academic exercise *Abington* said would not run afoul of the

Establishment Clause. The subjectivity of the single comparative statement does not strip away

any and all secular purpose of the curriculum, and the curriculum as a whole did not violate the

first *Lemon* prong.[10]

Certainly the comparative faith statement, if taken literally in isolation, is not purely

objective. As Defendants acknowledge, the statement "may have been wanting in accuracy or

tact." ECF No. 25. However, even if the comparative faith statement was inartful or, to some,

offensive, even in isolation, it is not *entirely* motivated by a purpose to advance religion. First,

the statement does not serve as a direct attack on any particular religion or belief. The statement

---

[10] Plaintiffs provide deposition testimony from Amy Hollstein, former assistant superintendent of instruction, and
Jack Tuttle, curriculum specialist, to suggest that the comparative faith statement was not factual and should not
have been used in the classroom. *See* ECF No. 55-7 at 28:21–29:2 (Hollstein Answer: "I think faith is spiritual, and I
think I have my own relationship with God, and I don't think you can calculate my own spirituality"); ECF No. 55-9
at 3 (Question: "If the teacher came up to you and said, I want to teach [the comparative faith statement], what
would you advise the teacher?" Tuttle Answer: "Not to do that"). But whether or not school officials, in their own
judgment, consider the subject material appropriate is immaterial to the Court's constitutional inquiry.

11

merely opines on the degree to which Muslims adhere to their own faith as compared to Christians. Second, the comparative faith statement was delivered by Mr. Bryden, who is a Christian.[11] As Plaintiffs acknowledged in the hearing, the fact that the statement was made by a Christian would seem to negate the possibility that the statement was made for the purpose of advancing the Islamic faith. Again, however, even using just the immediate context of the statement demonstrates it was not entirely devoid of secular purpose. According to the PowerPoint slide, the statement was provided within a discussion on the rise of radical Islamic fundamentalists, contrasting fundamentalists with other Muslims. ECF No. 1-1 at 2–3. In the relevant PowerPoint slide, the comparative faith statement is listed under the heading "Peaceful Islam v. Radical Fundamental Islam"[12] and the focus appears to be on teaching that fundamentalists represent a "small percentage of the population of Islam," and not on advocating that students should adhere to the faith. *Id.*

Second, the Court must consider whether the primary *effect* of the comparative faith statement, in the context of the class, was to advance or endorse religion. *See Mellen,* 327 F.3d at 347 ("the effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval of religion") (citation and internal quotations omitted); *see also County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter,* 492 U.S. 573, 597 (1989) ("[w]hen evaluating the effect of government conduct under the Establishment Clause, we must ascertain whether the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.") (citation and internal quotations omitted). According to Plaintiffs,

---

[11] During the hearing, Defendants stated, and Plaintiffs did not dispute, that Mr. Bryden identifies as Christian.
[12] While not explicitly stated, it would appear the slide seems designed to address Islamophobia, which the Court would view as a secular purpose.

subjectively opining that Muslims are stronger in their faith than Christians has the effect of promoting Islam because "it is sufficiently likely to be perceived by adherents of the controlling denomination [,] [Islam,] as an endorsement, and by nonadherents [Christians] as a disapproval, of their individual religious choices." ECF No. 55-1 at 13 (citing *Allegheny,* 492 U.S. at 597).

Here, it is not "sufficiently likely" that a singular reference to a Muslim's strength of faith, or the class as a whole, suggests that Defendants have endorsed Islam. As stated above, the statement is made in the context of an academic study and placed in a PowerPoint slide addressing the issue of "Radical Fundamental Islam," making the point that fundamentalists represent a small portion of Islam. ECF No. 1-1 at 2–3. The record does not show that Defendants, or anyone else, drew any conclusions from this statement or inferred that because Muslims' purportedly have a stronger faith, Islam was seen by the school as a superior religion. Plaintiffs argue that because they are devout Christians, and the statement offended their beliefs as Christians, Defendants have endorsed Islam. But even if such a statement is deeply offensive to Plaintiffs, its offensive nature alone does not cause it to run afoul of the Establishment Clause. *See Lee,* 505 U.S. at 597 ("We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive."); *see also Mellen,* 327 F.3d at 374 (citing *Barghout v. Bureau of Kosher Meat and Food Control,* 66 F.3d 1337, 1345) (4th Cir. 1995) ("This 'primary effect' prong must be assessed objectively, in order to measure whether the principal effect of government action 'is to suggest government preference for a particular religious view or for religion in general.'")).

Third, the Court must consider whether the comparative faith statement, or the curriculum itself, created an excessive entanglement between government and religion. *See Lemon,* 403 U.S. at 615 (entanglement is determined by "the character and purposes of the

institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority"). While Defendants did not rely on any Muslim clergy to deliver the subject material, *see Contra People of State of Ill. ex rel. McCollum v. Bd. of Ed. of Sch. Dist. No. 71, Champaign Cty., Ill.*, 333 U.S. 203 (1948) (holding that religious studies classes taught on school grounds by religious clergy violated the Establishment Clause), Plaintiffs argue that the comparative faith statement fosters an excessive entanglement in religion because the Defendants utilized "evangelist's mission statements." *See* ECF No. 55-1 at 13 (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 867 (1995)). However, in support of their position, Plaintiffs quote a passage from Justice Souter's dissent in *Rosenberger*, which merely suggests that topics cross the line from scholarly study to entanglement when "facially secular topics become platforms from which to call readers to fulfill the tenets of Christianity in their lives." *Id.* at 866–68 (Souter, J., dissenting). Far from encouraging students to fulfill the tenants of Islam, Defendants did not provide any direct benefit to Muslims, did not aide Muslims, and did not infer or suggest any relationship between the school and any Islamic organization. Therefore, the Court has no basis to find an excessive entanglement between government and religion. Thus, the curriculum survives all three prongs of the Lemon test.[13]

Defendants' motion for summary judgment is granted as to Plaintiffs' Establishment Clause claim.

---

[13] In *Mellen v. Bunting*, 327 F.3d 355, 370 (4th Cir. 2003), the Fourth Circuit noted that the Supreme Court, in addition to the *Lemon* test, has also applied the "endorsement test" and the "coercion test" in various Establishment Clause challenges. "Under the endorsement test, the government may not engage in a practice that suggests to the reasonable, informed observer that it is endorsing religion." *Id.* (citing *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984)). Pursuant to the coercion test, "government may not coerce anyone to support or participate in religion or its exercise." *Id.* (citing *Lee v. Weisman*, 505 U.S. 577, 587 (1992)). For the same reason the curriculum survives the *Lemon* test, it would survive these as well. The material was taught as part of an academic endeavor and neither the school administrators or the teacher endorsed a religion or coerced Ms. Wood to participate in religious exercises.

**B. Ms. Wood's First Amendment Free Speech Claim**

The requirement that Ms. Wood complete the fill-in-the blank assignment containing the Five Pillars of Islam, including the *Shahada,* implicates First Amendment protections against compelled speech. The Supreme Court has long held that the government may not compel the speech of private actors. *See United States v. United Foods, Inc.,* 533 U.S. 405, 413–15 (2001); *Wooley v. Maynard,* 430 U.S. 705, 714–15 (1977); *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943). Moreover, it is well-settled that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969). But "the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266 (1988) (citation and internal quotations omitted). As the Third Circuit has recognized, a student may be forced to speak or write on a particular topic but may not be forced to "profess beliefs or views with which the student does not agree." *C.N. v. Ridgewood Bd. of Educ.,* 430 F.3d 159, 186–87 (3d Cir. 2005).

As alleged in the Complaint, "Defendants require that students write out and *confess* the Shahada, the Islamic Profession of Faith." ECF No. 35 at 15 (citing ECF No. 1 ¶ 7) (emphasis in original). Thus, at the Motion to Dismiss stage, the Court found that "while discovery and trial may or may not prove otherwise," as alleged, the activity crossed the line from learning about Islam to compelling Ms. Wood's belief in Islam. ECF No. 35 at 15–16 (comparing *Barnette,* 319 U.S. at 642 ("[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matter of opinion or force citizens to confess by word or act their faith therein) *with Brinsdon v.*

*McAllen*, No. 15–40160, 2016 WL 4204797, at *6–7 (5th Cir. Aug. 9, 2016) (requiring student to recite Mexican pledge of allegiance in Spanish class did not violate First Amendment because there was no evidence that the required speech involved an attempt to compel the speaker's affirmative belief) and *Mozert v. Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058, 1069 (6th Cir. 1987) (no constitutional violation for required reading of texts offensive to some parents because the school did not require students to believe or say they believe the contents)).

Following discovery, the record is clear that Ms. Wood was not compelled to *confess* the *Shahada*; rather, she was simply asked to understand the significance of the statement to Muslims. ECF No. 1-2 (under "Beliefs and Practices: The Five Pillars," Ms. Wood was asked to fill in the following blanks: "There is no god but ____ and Muhammad is the ____ of Allah"). In the hearing, Plaintiffs conceded that there is no evidence that Ms. Wood was required to recite the *Shahada* aloud or listen to other students recite the *Shahada* in the classroom—the only exercise was the fill-in-the-blank assignment, which did not present the *Shahada* in a way that suggested the students should believe in the words of the *Shahada* itself. *Cf. Lee*, 505 U.S. at 593 (asking adolescent students to stand in silence as an alternative to reciting prayers during graduation ceremonies creates "subtle and indirect" peer pressure that "can be as real as any overt compulsion"). The fill-in-the-blank question was provided alongside other questions that served to test students' knowledge of the geographic and cultural origins of Islam. As a result, the "confession" alleged in the Amended Complaint was in actuality nothing beyond an academic exercise. *See Hazelwood*, 484 U.S. at 273 ("educators do not offend the First Amendment . . . so long as their actions are reasonably related to legitimate pedagogical concerns"). Therefore, Defendants' did not violate Ms. Wood's First Amendment protections when teaching about the *Shahada* within the contexts of its World History course.

## C.    Mr. Wood's First Amendment Claim

### 1.    Retaliation

Plaintiffs allege that Defendants banned Mr. Wood from school grounds because "they disagreed with his viewpoint that his daughter should receive alternative assignments to Defendants' unconstitutional promotion of Islam . . ." and their disagreement was "the sole reason for the no-trespass order." ECF No. 55-1 at 18. A plaintiff claiming First Amendment retaliation must demonstrate that "(1) [he] engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendants' conduct." *See Constantine v. Rectors and Visitors of George Mason University*, 411 F.3d 474, 499 (4th Cir. 2005); *see also Corales v. Bennett*, 567 F.3d 554 (9th Cir. 2009) (clarifying that the third prong requires that "the protected activity was a substantial or motivating factor in the defendant's conduct.").

Defendants argue that they are entitled to summary judgment on Mr. Wood's retaliation claim because Mr. Wood did not engage in protected speech under the First Amendment. ECF No. 54-1 at 36. Not all speech is protected speech, and the narrowly limited classes of speech that remain unprotected include true threats. *United States v. Cassidy*, 814 F. Supp. 2d 574, 583 (citing *Watts v. United States*, 394 U.S. 705 (1969)); *see also United States v. White*, 670 F.3d 498, 507 (4th Cir. 2012) (true threats are words that by their very utterance inflict injury, and the prevention of such speech has never been thought to raise any Constitutional problem) (internal citations omitted). In support of their motion, Defendants cite *Lovern v. Edwards*, 190 F.3d 648, 655–56 (4th Cir. 1999) for the proposition that school officials have the authority and responsibility to control parents in order to prevent disruptions to the school environment. ECF

17

No. 54-1 at 36. But *Lovern* is factually and procedurally distinguishable from this case. In *Lovern*, the Fourth Circuit recognized that the plaintiff was banned from school grounds following a "continuing pattern of verbal abuse and threatening behavior towards school officials" that took place *after* he was permitted to air his concerns numerous times while on school property. 190 F.3d at 656 n.13. Ultimately, the Fourth Circuit determined that the plaintiff's desire to have "boundless access to school property" was clearly frivolous. *Id.* at 656.

Here, Mr. Wood never made it to school grounds. Further, the record shows that Mr. Wood was attempting to speak out against his daughter's participation in the subject curriculum, and parents criticizing school officials are clearly protected by the First Amendment. *Jenkins v. Rock Hill Local School Dist.*, 513 F.3d 580, 588 (6th Cir. 2008); *see also Chiu v. Plano Independent School Dist.*, 260 F.3d 330, 343–44 (5th Cir. 2001) (speaking against a change in public school curriculum is an issue of public concern for parents of students enrolled in the school district and is protected under the First Amendment). Defendants fail to point to any cases suggesting that Mr. Wood's legitimate objection, even if presented in a threating and hostile manner, falls within the limited category of threatening speech not protected by the First Amendment. *Cf. R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 384–85 (1992) ("It is not true that fighting words have a de minimis expressive content or that their content is in all respects worthless and undeserving of constitutional protection; sometimes they are quite expressive indeed.") (internal citation and quotations omitted).

However, even if Mr. Wood engaged in protected speech, and the No Trespass Order inhibited his continued ability to do so, Plaintiffs cannot show a causal relationship between his protected speech and Defendants' decision to issue the No Trespass Order. The record indicates that Defendants issued the No Trespass Order based on its perception of the threats of disruption

following notification of Mr. Wood's Facebook® posts, not in objection to Mr. Wood's protected speech.[14] While Mr. Wood voiced his opposition to Defendants' curriculum in these posts, he also suggested that he would come to school and cause a disruption. The following passages from Mr. Wood himself are particularly telling:

- "My white ass is going into school on Monday and letting my feelings be known."

- "[a] 556 [type of ammunition] doesn't study Islam and it kills them fuckers every day."

- "I plan on using the paper [Ms. Wood's shredded homework assignment] as confetti on Monday!"

ECF No. 54-2 at 19, 20, 22.

Plaintiffs attempt to mitigate the confrontational nature of some of these posts. *See* ECF No. 55-1 at 16 ("Although oddly and amusingly, Defendants attempt to manufacture a threat out of confetti."). However, beyond voicing his opposition to the curriculum through, as Plaintiffs acknowledge, use of "coarse language," Mr. Wood suggested that he was going to cause a disturbance at La Plata High School.

Further, Principal Arnold's deposition testimony indicates that she perceived Mr. Wood's Facebook® posts as threatening and issued the No Trespass Order within an hour of discussing her specific concerns with her Central Office superiors. ECF No. 54-4 at 6–8; *see also* ECF No. 54-2 ¶ 15 ("I [Principal Arnold] regarded Mr. Wood's Facebook® posts as threatening, and I grew increasingly concerned about his potential disturbance at La Plata, particularly in light of

---

[14] While Plaintiffs allege that Defendants issued the No Trespass Order based on Mr. Wood's belief that the school was engaging in the unconstitutional promotion of Islam, ECF No. 55-1 (citing ECF No. 55-4 (declaration of J. Wood)), Mr. Wood's unsupported speculation to this point cannot create a genuine issue of material fact necessary to survive a motion for summary judgment. *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

the [flurry] of Homecoming activities and increased number of visitors during that time."). Her email to Central Office further demonstrates her safety concern as she expressed concerns about Mr. Wood's demeanor and the possibility he might have access to weapons. ECF No. 54-2 at 18.[15] In addition, Sgt. Kaylor's deposition testimony indicates that he wrote the No Trespass Order as a result of Mr. Wood making what he perceived to be verbal threats against the school through his Facebook® posts. ECF No. 54-8 at 9. Accordingly, even if Plaintiffs might believe it was an overreaction, the record is clear that Defendants issued the No Trespass Order in response to perceived threats of a disruption on school grounds, not in retaliation against Mr. Wood's protected speech.[16] *See, e.g., Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (noting that temporal proximity between protected activity and adverse action is not dispositive of a retaliation claim when the adverse action is otherwise justified).

### 2. Free Speech

In their Cross Motion for Summary Judgment, Plaintiffs introduce arguments that Defendants' issuance of the No Trespass Order was also an unconstitutional restriction on Mr. Wood's freedom of speech. *See* ECF No. 55-1 at 20 ("not only did Defendants ban Mr. Wood *for* exercising his First Amendment right to free speech, but the no-trespass order was also a prior restraint on his ability to exercise his First Amendment rights on school grounds in the future.") (emphasis in original). This additional First Amendment claim goes beyond the scope of the claims currently before the Court. Specifically, Claim III only alleges that the No Trespass Order

---

[15] While Plaintiffs contend there is a dispute regarding the tone and demeanor of Mr. Wood's communications, there is no dispute that the nature of the communication caused Principal Arnold serious concern as it is reflected in the email she sent at that time.

[16] In the hearing, Plaintiffs suggested that Defendants' assertion of a perceived threat was a pretext for retaliation because if Defendants truly perceived that Mr. Wood was a threat, they would have taken more drastic action such as requesting additional police presence or social services intervention. However, the more reasonable inference to draw is that Defendants feared a disruption if Mr. Wood came to school grounds, not that Mr. Wood was coming to cause a disturbance or act of violence irrespective of the No Trespass Order. As such, the No Trespass Order was tailored to the perceived threat, as contemporaneously documented by Defendants, and was not a pretext for retaliation.

was issued in retaliation for Mr. Wood's protected activity; it does not suggest that the No

Trespass Order subsequently abridged Mr. Wood's free speech rights. While Mr. Wood's

Procedural Due Process Claim, Claim IV, could be construed to include a claim under his First

Amendment right to free speech, *see* ECF No. 39 ¶ 121, the Court previously dismissed this

claim. Specifically, the Court found that Mr. Wood was provided with sufficient process and

simply chose not to avail himself of procedures available to him. ECF No. 35 at 19–22. Thus,

whether the arguments in Plaintiffs' Cross Motion reflect an attempt to state a claim never

included in a Complaint or one that has already been dismissed, they are not relevant to any

claim currently pending before the Court.

However, even if Mr. Wood's First Amendment free speech claim is properly before the

Court at this time, Plaintiffs are still not entitled to relief. In assessing a First Amendment free

speech claim, a court must determine whether the plaintiff was engaged in protected speech,

identify the nature of the forum in which the protected speech was raised, and assess whether the

justifications for exclusion from the relevant forum satisfy the requisite standard. *Goulart v.*

*Meadows*, 345 F.3d 239, 246 (4th Cir. 2003) (citing *Cornelius v. NAACP Legal Def. & Educ.*

*Fund, Inc.*, 473 U.S. 788, 797 (1985)). The three recognized fora are the traditional public forum,

the nonpublic forum, and the designated or limited public forum. *Id.* at 248 (citing *Ark. Educ.*

*Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998)).[17]

For the designated and limited public fora, a court must apply either an "internal

standard" to situations where "the government excludes a speaker who falls within the class to

which a designated [limited] public forum is made generally available," or an "external standard"

for all others. *Goulart*, 345 F.3d at 250 (citing *Warren v. Fairfax County*, 196 F.3d 186 (4th

Cir.1999) (en banc)). Under the internal standard, a limited public forum is treated as a

---

[17] For the purpose of the analysis herein, the Court presumes that Mr. Wood's conduct was protected speech.

traditional public forum, such that government exclusion of speech is subject to strict scrutiny. *Id.* Under the external standard, a limited public forum is treated as a nonpublic forum, such that government control of speech must be viewpoint neutral and reasonable in light of the objective purposes served by the forum. *Id.* "Once a limited forum has been created, entities of a 'similar character' to those allowed access may not be excluded." *Id.* Public school facilities are limited public fora during after-school hours. *Id.* Although Defendants argue correctly that La Plata is a nonpublic forum during school hours, the No Trespass Order went beyond limiting Mr. Wood from coming to school during school hours and instead limited all access to school grounds. Therefore, Mr. Wood was banned from La Plata at times when it was a limited public forum.

Plaintiffs argue that as a parent of a student at La Plata, Mr. Wood is "undoubtedly within the class to whom parent/teacher conferences, Parent Teacher School Organization meetings and events, and celebratory events honoring his daughter at the school are made generally available," and Defendants' decision to issue the No Trespass Order is therefore subject to strict scrutiny. ECF No. 55-1 at 22 (emphasis in original); *see also Bostic v. Schaefer*, 760 F.3d 352, 377 (4th Cir. 2014) (under strict scrutiny, Defendants' actions may be justified only if narrowly tailored to a compelling state interest). However, Plaintiffs' characterization of Mr. Wood as a parent of "similar character" to other parents ignores the simple fact that in addition to voicing his objections to the curriculum, Mr. Wood, unlike all other parents for which the forum is open, caused school officials to be concerned about safety at the school. As such, Defendants' decision to issue the No Trespass Order is not subject to strict scrutiny under the limited public forum internal standard. Rather, under the external standard, the No Trespass Order must be viewpoint neutral and reasonable in light of the objective purpose of the limited public forum (*i.e.*, allowing parents to participate in school-related functions). As previously discussed, the No Trespass

22

Order was not based on Mr. Wood's objections to the curriculum, was limited in duration,[18] and

was reasonable in order to ensure that Mr. Wood did not disrupt school-related functions

reserved for other parents. *See American Civil Liberties Union v. Mote*, 423 F.3d 438, 445 (4th

Cir. 2005) (citing *Cornelius*, 473 U.S. at 808) (a school's decision to restrict speech in a limited

public forum under the external standard "need only be reasonable; it need not be the most

reasonable or the only reasonable limitation") (emphasis in original). As such, even if Mr. Wood

had a free speech claim pending before the Court, it would fail.

### D.    Ms. Wood's Article 36 Claim

Plaintiffs do not allege that Article 36 provides Ms. Wood with more expansive

protections than she is entitled to under its federal corollary. Because the Court finds that

Defendants did not violate Ms. Wood's First Amendment protections, the Court must also grant

Defendants' Motion for Summary Judgment on Ms. Wood's Article 36 Claim and need not

address whether Article 36 gives rise to a private cause of action for damages. *See Booth v.*

*Maryland Dept. of Public Safety & Correctional Services*, No. RDB 05-1972, 2008 WL

2484937, at *8 (D. Md. June 18, 2008) (citing *Supermarkets General Corp. v. State*, 286 Md.

611 (1979) ("Maryland courts have repeatedly decided cases on the assumption that the free

exercise provision of Article 36 is *in pari materia* with the First Amendment.")).

### IV.    Motion to Amend

Separately, Plaintiffs move to file a Second Amended Complaint, ECF No. 47, in an

attempt to add Bryden, Tuttle, Superintendent Kimberly Hill, and Assistant Superintendent

Hollstein as named defendants. Plaintiffs allege that they only learned of these individuals'

involvement following depositions taken on March 23 and 24, 2017, constituting good cause to

---

[18] While Plaintiffs argue that Mr. Wood was categorically banned from all school-related activities for over a year, the record indicates that the "No Trespass Order could be rescinded if Mr. Wood calmly met with me [Principal Arnold] to discuss it." ECF No. 54-2 ¶ 17; *see also* ECF No. 54-8 at 7.

amend their complaint pursuant to Federal Rule of Civil Procedure 16(b). ECF No. 47-1 at 2. However, the Court need not consider Plaintiffs' arguments, as the Court evaluated the alleged constitutional violations in their entirety, without regard to which actions were taken by the named defendants as compared to the proposed defendants. As such, Plaintiffs' motion is denied as moot.

## V.       CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment, ECF No. 54, deny Plaintiffs' Cross Motion for Summary Judgment, ECF No. 55, and deny Plaintiffs' Second Motion to Amend/Correct the Amended Complaint, ECF No. 47. A separate Order follows.

Dated: March 26, 2018

GEORGE J. HAZEL
United States District Judge

24